Isaac ROKOWSKY et al., Plaintiffs,

v.

Robert GORDON et al., Defendants.

Civ. A. Nos. 78-3316, 3259 and 3260.

United States District Court,
D. Massachusetts.

Nov. 19, 1980.

Barry I. Fredericks, Goldschmidt, Fredericks, Kurzman & Oshatz, New York City, for Isaac Rokowsky, Michael Swerdlow & Alida Realty, Inc.

David Hanrahan, Gilman, McLaughlin & Hanrahan, Boston, Mass., for Dorothy Gordon, Lola, Jacobson as executrices of Estate of Maurice Gordon.

Arthur M. Gilman, Boston, Mass., for Robert Gordon and Lola Jacobson.

## FINDINGS, RULINGS, AND ORDER FOR JUDGMENT

SKINNER, District Judge.

These three consolidated cases arise out of an aborted agreement to sell commercial real estate in Massachusetts. In the first case, Rokowsky, one of the prospective purchasers, seeks to recover on a promissory note in the amount of $540,000 issued in the course of the deterioration of the transaction. In the second and third cases, Robert Gordon and his sister Lola H. Jacobson, owners of the beneficial interest in 26 of the 28 parcels to be sold, and the executrices of the Estate of Maurice Gordon, which owned the other two parcels, claim damages for breach of contract against Alida Realty, Inc., the nominal purchaser, and its disclosed principals Isaac Rokowsky and Michael Swerdlow. By amendment, they also seek damages for fraud in the inducement of the agreement.

In the second and third cases, Rokowsky and the other defendants have counterclaimed for fraudulent misrepresentation concerning the outstanding leases of some of the properties and their operating costs.

## FINDINGS OF FACT

Swerdlow, a New York lawyer, learned that the Gordon properties were for sale sometime in 1973. He entered into preliminary negotiations with representatives of the Gordons. He then contacted Isaac Rokowsky, also of New York, who was and is a broker and dealer in real estate and real estate financing. Mr. Rokowsky was originally brought into the deal to provide the money and to negotiate the financial aspects of the transaction. In fact, all of the subsequent negotiations were conducted for the buyers principally by Rokowsky, with the assistance of his lawyer, Edward Breger, Esq.

Mr. Rokowsky in turn contacted Mr. Ben Zion Schalom Eliazor Freshwater, an English financier, who was at that time assisting his father Osias Mayer Freshwater, the managing director of the Freshwater Group of companies, a complex of over 200 public

or private companies with very large real estate holdings. Rokowsky represented the Freshwater Group in many of its transactions in the United States. Since the death of his father, Mr. Ben Zion Schalom Eliazor Freshwater has been the managing director of the Freshwater Group. I find that Mr. Freshwater put up the initial deposit of $600,000 and expressed an interest in putting up additional funds, in return for some shares in the properties purchased. I find that Mr. Freshwater never committed himself or his companies to put up any specific amount of cash over and above the initial $600,000 and that the size of his share in the property to be purchased was never settled. I find, however, that he was an undisclosed principal in this transaction, that he anticipated sharing in the property, and that he instructed Mr. Rokowsky to proceed with efforts to secure the property.

After considerable negotiation, two parallel purchase and sale contracts were executed, the first between the various real estate corporations owned by Robert Gordon and Lola H. Jacobson as sellers, and Alida Realty, Inc. as buyer, and the second between the executrices of the Estate of Maurice Gordon as seller and Alida Realty, Inc. as buyer. I find that the two contracts were treated by all concerned as parts of a single transaction. These contracts were executed February 12, 1974, and called for a closing on June 28, 1974. They specify that they "shall be construed and enforced in accordance with the laws of Massachusetts."

■ I find that Alida Realty, Inc. was a dummy corporation created by Attorney Breger for the convenience of his clients. At the beginning of each year he created such a corporation to act as a straw or conduit for his clients. At the end of the year the corporation would be dissolved. The office dummy for 1974 was Alida Realty, Inc. It had no assets, no capital stock and no stockholders. During 1974 it acted as a straw or conduit for over 100 of Mr. Breger's clients in over 200 transactions. It was contemplated that after the closing, the property would immediately be transferred to Rokowsky, Swerdlow and Freshwater in whatever proportion was eventually worked out among them. All the contract negotiations were conducted or controlled by Rokowsky, who was not an officer of Alida Realty, Inc.

■ Rokowsky and Swerdlow now assert that Alida Realty, Inc. was known to all parties to be the purchaser and that the sellers knew that they could only look to the corporation for any damages. I reject this contention. I find that the sellers justifiably considered Rokowsky and Swerdlow to be the principals in the transaction, that they looked to them personally to raise the necessary financing, and that Alida Realty, Inc. was treated by all parties as a device of convenience, to hold title temporarily as a straw or conduit. I find and rule that Rokowsky and Swerdlow are not protected from whatever liability there may be under the February 12 contracts by reason of the use of Alida Realty, Inc. as a nominee. *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968).

Both contracts contained provisions for liquidated damages, however, in effect limiting the liability of the purchasers for breach of contract to the amount of the deposit on each contract, which was $540,000 in the corporation's contract and $60,000 in the estate contract. The deposit and the liquidated damages provision were both incorporated in Paragraph R of each agreement, which were identical.[1] This provision

---

1. R. The Escrow Agents join herein to acknowledge their receipt of the deposit, in whatever form it takes, in accordance with the provisions of Paragraph E hereof, and their undertaking to hold and dispose of the same as follows:

(i) At the closing to deliver the same to the Sellers and the interest thereon, if any, to the Buyer;

(ii) If, at the time and place for closing, the Buyer shall default in the performance of its obligations hereunder, to deliver the same and interest thereon, if any, to the Sellers, as liquidated damages;

(III) If, at the time and place for closing, the Sellers shall default in the performance of their obligations hereunder, to deliver the same to the Buyer, without prejudice to such

reinforces the conclusion reached above that the parties did not rely on the corporate nominee to limit liability.

Prior to the execution of the contract, various lawyers and real estate management experts had viewed all the Gordon buildings and had examined many of the leases. After February 12, 1974, this activity intensified. Moe Bordwin, an associate of Swerdlow, took up permanent residence outside of Boston, and with a small legal and clerical staff proceeded to go through all the leases, contracts, payrolls and other documents relating to the various properties. Robert Gordon provided office space to Mr. Bordwin for this purpose and gave him unrestricted access to the pertinent files.

On June 12, 1974, Attorney Breger wrote a letter to the sellers' attorney containing a long list of alleged discrepancies in descriptions of the properties as recited in the contract documents and alleged deficiencies in documentation. In a rare moment of candor, however, Mr. Rokowsky conceded at the trial that the true extent of the property was known to him and that he never intended to purchase the areas erroneously included in the contract descriptions. The other matters were either of no consequence or were corrected in due course.

I find that there were a number of errors in the description of the properties, their income and operating costs in the contract documents. There is no evidence whatsoever of a fraudulent intent on the part of the Gordons, however, and, in fact, Gordon's grant of access to Bordwin was inconsistent with a fraudulent intent. I find that the errors resulted from the size and haphazard recordkeeping of the Gordon operation, and were unintentional. I find that the evidence in no way sustains the allegation of fraud in the counterclaims of Rokowsky, et al.

In early June of 1974, Rokowsky informed the sellers that he could not raise the $16 million in cash required by the February 12 contract and that the deal would have to be restructured. I find, however, that Rokowsky never made any serious effort to raise $16 million, nor did he call on Mr. Freshwater to do so. I find that Rokowsky in fact never intended to pay $16 million in cash, even at the time the contract was executed. His representation to the Gordons that if he could not raise this amount through banks he could get it from Freshwater was a lie. I further find that Rokowsky consistently and continuously lied to the Gordons and subsequently lied to this court concerning his intention to pay $16 million of the purchase price in cash and concerning the availability of cash for that purpose. I find that Rokowsky had intended from the first to wait until the Gordons were firmly committed to the sale, and had incurred considerable expense to consummate it, and then to take advantage of a deteriorating real estate market to renegotiate a deal more favorable to himself and his associates.

In any case, Rokowsky was successful in persuading the sellers to renegotiate the agreements so that the buyers would come up with $6 million cash and give a purchase money mortgage for $10 million, with a "take out" provision after three years. A "take-out" is an arrangement by which a financial institution or other financing source would agree to buy the purchase money mortgage for the principal balance remaining after the agreed period.

The sellers were concerned that the new arrangement would not produce sufficient cash to pay anticipated capital gains taxes. They were willing to explore the possibility of converting the sale of the corporately-owned parcels to a sale of corporate stocks, which might alleviate the capital gain impact. For this purpose the closing date of the February 12 agreement was extended

other rights and remedies as the Buyer may have arising from such default;

subject, in all of such cases, to instructions to the contrary signed by all of the Sellers and by the Buyer.

\*    \*    \*    \*    \*    \*

to permit the construction of an alternate arrangement. The first extension was to July 8, 1974 and then to July 17, 1974.

On July 16, 1974, Swerdlow, Rokowsky and Breger met with attorneys for the sellers at Swerdlow's office in Great Neck, Long Island. The sellers' lawyers were Stanley Rudman, representing the corporations, Jordan Ring, representing the estate, and Norman Byrnes, a real estate expert engaged to prepare the documents of sale for all the sellers.

Rokowsky and Swerdlow reported that they could not arrange the "take–out" provision and that the sellers would have to take a straight purchase money mortgage. They also asked for an additional extension of time. Rudman and Ring agreed to the new deal, subject to the condition that the $600,000 of deposit money be released so that the Gordon interests could pay real estate taxes. Rokowsky agreed, but required that Robert Gordon and Lola Jacobson give him a negotiable promissory note for $540,000. He demanded the same of the estate for $60,000, but Ring refused, and Rokowsky accepted the personal guarantee of the executrices to repay the money in the event of a default by the estate. Rudman refused on behalf of Robert Gordon and Lola Jacobson to give a negotiable note but agreed to a nonnegotiable note. The extension of time, the release of the deposit and the grant of the note were made in specific express reliance on Rokowsky's unequivocal statement that he had at that time an absolute commitment for $6 million. This was another lie by Rokowsky.

Rudman testified that at the time of this agreement, he said to Rokowsky, "I will not give a negotiable note for $540,000. On your representation that you have $6 million available, I'll give you a nonnegotiable noninterest bearing note for $540,000 and with a clear understanding that there is no way you're ever going to be paid that $540,-000 except as a credit of that note for 540 [sic] against the purchase price pursuant to the termination of our agreement." (Tr. 7–24).[2]

It was also agreed, however, that Rokowsky would be entitled to the $540,000 if the sale did not go through because of the sellers' default. (Tr. 7–27).

This testimony is denied by Rokowsky, who claims in substance that the amount of the note was to be either credited to the purchase price or paid to him if the deal fell through for any reason. I believe Rudman and disbelieve Rokowsky's testimony insofar as it conflicts with Rudman's testimony.

Under date of July 16, 1974, a release of the escrow was executed by Alida Realty, Inc., together with an amendment of the February 12, agreement between the corporate sellers and Alida Realty, Inc. This amendment provided as follows:

"1.  The date for closing is extended to August 1, 1974.

2.  The deposit heretofore held by the escrow agents is to be returned to Edward E. Breger, Esq., attorney for the buyer, and all provisions for escrow set forth in paragraph R are hereby terminated and the deposit shall not serve as a credit to purchasers.

Except as thus amended, said agreement [of February 12, 1974] will remain in full force and effect in accordance with its original terms."

The amendment further recited that it was executed as a sealed instrument.

On July 18, 1974, a promissory note in the amount of $540,000, non–negotiable, without interest and in form unconditional, was executed in Massachusetts by Robert Gordon and Lola Jacobson individually, payable to Isaac Rokowsky individually. $540,000 of the escrow fund was transferred by the escrow holder to Breger, who paid it over to Rokowsky, who in turn paid it out of his own account to Gordon.

The escrow provisions in Paragraph R of the February 12 agreement also contain the limitation of liability relied upon by Swerdlow and Rokowsky. The Gordons now as-

---

**2.**  There are two transcripts for the seventh day of trial, each with this pagination. The quoted

testimony appears in the transcript of the afternoon session of December 13, 1979.

sert that the quoted amendment eliminated the limitation of liability by its purported termination of Paragraph R. (See n. 1, *supra*). Such a result was never discussed or contemplated by the participants at the July 16th conference, and I find that none of the parties intended to eliminate the limitation of liability contained in the original agreement. I find that the quoted amendment was drawn on the spot (and indeed part of it is handwritten), that it is ambiguous in this respect and that its arguable elimination of the limitation of liability was the inadvertent result of careless draftmanship.

Thereafter, the closing date was further extended by oral agreement to August 28, 1974, and August 26 was set for a rehearsal, at which all of the closing documents would be reviewed and approved for delivery on the 28th.[3] I find that by August 26, Attorney Byrnes had produced all the necessary documents, resolved all the title questions, and either had secured all the necessary releases or was in a position to secure them by August 28th. It is the testimony of Byrnes, Rudman, and to an extent Ring, that on August 26 Rokowsky and Breger appeared at Byrnes' office and advised them that Rokowsky was unable to raise $6 million cash, and that they could not go through with the purchase unless the sellers subordinated their $10 million purchase money mortgage to a $3.5 million bank mortgage. Ring rejected the new proposal on the spot. Rudman left to present this new proposal to Robert Gordon. After discussion with Gordon he made a telephone call to Byrnes' office and told Byrnes that the new proposal was unacceptable and the deal was dead. Byrnes was not positive but testified that it was his best recollection that Rokowsky and Breger were still in his office when the call came in, and that he informed them of Gordon's response.

Rokowsky and Breger relate a totally different version of this meeting. They say they spent about five hours discussing documents, that they informed Byrnes, Rudman and Ring of the necessity of subordinating the purchase money mortgage to a $3.5 million bank loan, and that they left the meeting with the understanding that the three attorneys would consult with their clients and get back to Breger with their response.[4] Rokowsky was impeached so many times and in so many ways during the trial that his credibility was totally destroyed, and I would not accept any disputed testimony of his. Breger was not directly impeached, and his version of the meeting is supported by a letter which he sent the following day to Byrnes, Rudman and Ring containing the following two paragraphs:

> I am sorry that Stanley [Rudman] was obliged to leave before we completed our discussion. However, in view of the fact that you are submitting the proposal to your respective clients, I am certain that we will be able to reach some accord. We are also discussing the proposal with other sources with a view toward an expeditious closing.

In support of the other view is the uncontested fact that Ring made a formal appearance at Byrnes' office on August 28, 1974 for the purpose of tendering the required deeds. On the same day he wrote Breger and Rokowsky that "the Buyer" (presumably under the February 12 Agreement) was in default. Rokowsky has not challenged this notice of default and has never sought to recover his $60,000 deposit from the estate of Maurice Gordon.

Neither Byrnes nor Rudman replied to Breger's letter of August 27. Robert Gordon did list the properties with a broker immediately after being informed on August 26 that Rokowsky could not go forward with the deal as proposed on July 16.

---

3. The parties contemplated not only the execution of deeds but the execution of new agreements in substitution for the agreements of February 12. Up to this point, the February 12 agreements were the only written agreements between the parties, and were still in force.

4. Breger admitted that Ring initially rejected the proposal, but testified that Ring always responded that way to any suggestion, and that he expected Ring to discuss it with his clients.

Thereafter he sought to interest other purchasers in the properties and eventually sold them off, most of them to William Kent as trustee for purported Kuwaiti interests.

The lawyers for Gordon also continued sporadically to negotiate with Rokowsky and Breger for the sale of the properties throughout the remainder of 1974 and the first half of 1975. Some of those negotiations did contemplate a subordinated purchase money mortgage along the lines proposed by Rokowsky on August 26. I find that in the deteriorating real estate market of late 1974 and 1975 the Gordons were ready and willing to sell to anyone, including Rokowsky. In their dealings with Rokowsky I find that Rudman and other representatives of the Gordons made it clear that there would be no new deal (or adjustment of the old deal, as the case may be) until Rokowsky could demonstrate that he had actual, enforceable commitments for his financing.

I find that Rokowsky never at any time came up with firm financing of any kind sufficient to enable him to purchase the Gordon properties under any of the arrangements discussed by the parties.

During the sporadic discussions with Rokowsky in late 1974 and early 1975, Gordon sold off several of the real estate parcels included in the February 12 agreement. In mid–1975, Rokowsky apparently faded out of the picture and the sale of the remaining properties to Kent took place in August 1975. The aggregate price received by the Gordon corporations was $4,977,258 and by the Gordon estate $1,491,015 less than the prices established by the two agreements of February 12, 1974.

When he learned of the sale to Kent, Rokowsky brought the instant suit on the $540,000 note. He also brought a suit in the state court seeking an injunction of the sale to Kent on the ground that he had a right of first refusal as to the properties. The Gordons were forced to pay him $75,000 to clear the record of the lis pendens filed in connection with that suit. Rokowsky admits that the sworn petition in that case contained false statements and his testimony in this case makes it clear that his assertion of a right of first refusal was a sham. (Tr. 2–103 through 2–114).

### RULINGS OF LAW

1. In the first case, in which Rokowsky seeks recovery of the $540,000 promissory note, the key legal issue is the application of the parol evidence rule, which in turn depends upon whether the note is an integrated contract. Rokowsky argues that the law of New York applies. I disagree. The note was executed in Massachusetts by Massachusetts residents in aid of protracted negotiations concerning Massachusetts real estate owned by Massachusetts corporations. Furthermore, the note was given in connection with a release of escrow and extension of time which was in the form of an amendment to an agreement which provided that the law of Massachusetts would apply. In a diversity case, we are to apply the conflicts rule which is most likely to be applied by the Supreme Judicial Court of Massachusetts on similar facts. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Massachusetts law, the parties' choice of law will be given effect if it bears a reasonable relationship to the transaction and does not violate public policy. *Steranko v. Inforex, Inc.*, 5 Mass.App. 253, 362 N.E.2d 222 (1977). The two documents represented the several aspects of a single transaction, and it would be absurd to have them governed by different law. Furthermore, the law applicable to a note is the law of the place where the note is payable. *Walling v. Cushman*, 238 Mass. 62, 65, 130 N.E. 175 (1921). A demand note is payable at the place of residence of the maker if no place of payment is named in the note. 11 *Am.Jur.*2d, Bills and Notes § 89. Under all of these circumstances, the law of Massachusetts clearly governs.

Under Massachusetts law, whether a writing constitutes an integrated contract is a question of the intention of the parties. *Caputo v. Continental Construction Corp.*, 340 Mass. 15, 18, 162 N.E.2d 813,

816 (1959). This is a preliminary question of fact for the court. *Carlo Bianchi & Co., Inc. v. Builders' Equipment & Supplies Co.,* 347 Mass. 636, 643, 199 N.E.2d 519, 524 (1964). A writing which appears on its face to be complete is presumed to be an integrated contract, in the absence of contrary evidence. *Robert Industries, Inc. v. Spence,* 362 Mass. 751, 754, 291 N.E.2d 407, 409 (1973).

The same principle applies to promissory notes. *Trustees of Tufts College v. Parlane Sportswear Co. Inc.,* 4 Mass.App. 783, 342 N.E.2d 727, 728 (1976), citing *Robert Industries, Inc. v. Spence, supra.*

The note in this case represents but one aspect of a complex transaction. It is clear from all of the contemporary and subsequent drafts of contract amendments that the note was part of a restructuring of the deposit arrangement, exacted as a condition of present use of the deposit by the sellers. It was contemplated by all the parties that the note would be satisfied by a credit at the closing unless the deal fell through, an understanding that does not appear on the face of the instrument, and is inconsistent with its "demand" provision.

I find and rule that the promissory note dated July 18, 1974 was not an integrated contract. Consequently, the parol evidence rule does not apply, and the note is subject to the oral conditions imposed at the conference on July 16, 1974 between Rudman and Rokowsky, namely, that the note would be paid only (1) by way of a credit against purchase price at a closing of the real estate agreement or (2) in the event of a default by the Gordons. Since neither of these conditions were fulfilled, Rokowsky is not entitled to payment of the note. Accordingly, judgment shall be entered for the defendant in the first case (CA # 78–3316–S), with costs.

2. In the second and third cases, Robert Gordon and Lola Jacobson, as assignees of the original selling corporations, and Dorothy Gordon and Lola Jacobson, executrices of the estate of Maurice Gordon seek damages for breach of contract. Rokowsky, Swerdlow and Alida Realty, Inc., who are the defendants, claim that the two agreements of February 12, were abandoned by both parties. I find and rule, however, that performance under those agreements was conditionally waived by the Gordons, subject to the condition that parties execute and perform a substitute agreement. This conclusion is supported by the recitation in the July 16 release of escrow and purported deletion of Paragraph R that the February 12 agreement otherwise remain in full force and effect.

As to the claim of the executrices, the resolution of the issues is relatively simple. When the time agreed for performance, August 28, 1974, arrived, Mr. Ring tendered performance on behalf of the estate. The purchasers neither tendered performance nor satisfied the condition upon which performance had been waived. Mr. Ring immediately notified them that they were in default. I rule that the defendants were in default as of August 28, 1974, and that all further negotiations between the estate and Rokowsky looked toward a new agreement and not a revival of the old one.

The position of Robert Gordon and Lola Jacobson as successors to the corporate sellers is less clear. The defendants in this case, the purchasers, argue that there was no unequivocal notice of default such as to put them in default as of August 28, 1974, and under the various negotiated extensions of time, time was not of the essence.

Those considerations would be important in determining whether the purchasers were in default *as of August 28, 1974,* and that in turn would be an important question if the purchasers had tendered performance at some later date and been refused. In this case, however, the purchasers never secured the financing to perform under the original agreement of February 12, the proposed modification of June 1974, the further proposed modification of July 16, 1974, or even under any of the arrangements subsequently discussed. I find and rule that the sellers' waiver of performance under the February 12 agreement, to the extent that it continued after August 28,

1974, continued to be conditioned on the execution and performance of a mutually satisfactory substituted agreement either by August 28, 1974 or within a reasonable time thereafter. I rule that completion of the deal within a reasonable time was implicit, and that a reasonable time had clearly expired by the summer of 1975. In view of the purchasers' ultimate breach of contract, there is no need for me to decide the difficult question of whether the purchasers were in default on August 28, 1974.

Defendants claim that they cannot be held in default and held liable for breach of the corporate agreements of February 12, 1974, because the sellers were not ready at any time to perform in accordance with those agreements. This is true, and ordinarily one party may not hold the other in default unless it is ready to perform. The sellers, however, with considerable effort, had made themselves ready to perform according to the proposed amendments to the agreements negotiated on July 16. This was done at the instance of the purchasers, who had failed to produce the purchase price as originally agreed. Not only was the altered performance prepared at the request of the purchasers, it was done in reliance on Rokowsky's out and out flat lie to Rudman that the $6 million cash payment was actually available. Under these circumstances, to permit the purchasers to take advantage of the fact that the proffered performance of the sellers was not in accordance with the original contract would be unconscionable, and a gross misapplication of the rule.

Notwithstanding all of the foregoing, the plaintiffs in the two cases, the two groups of sellers, are not entitled to recover damages for breach of contract. I have found that the document of July 16, 1974 releasing the escrow was not effective to eliminate the provision for liquidated damages. I find and rule that the transfer of funds to the sellers on or about July 18, 1974 was an advance of the funds theretofore segregated as liquidated damages, and was not intended to be an additional penalty. The plaintiffs have therefore received everything to which they are entitled, and judgment will be entered for the defendants on Count 1 in C.A. 3259-S and Count 1 in C.A. 3260-S.

Because of the reprehensible conduct of Rokowsky in conducting the negotiations and his lack of candor at trial, the defendants shall not recover their costs. Fed.R. Civ.P. 54(d).

3. The facts found on page 1118, *supra*, require the dismissal of the defendants' counterclaims in cases C.A. 3259-S and 3260-S.

4. During the trial, the plaintiffs in the second and third cases moved to amend their complaints to add a second count for fraud in the inducement of the agreement of February 12, 1974. A late amendment to conform to the evidence is permissible under the Fed.R.Civ.P. 15(b), and there is ample evidence of fraud in Rokowsky's false statements concerning his present intention to pay $16 million in cash and his capacity to raise such a sum.

Accordingly, the motions to amend the complaints in the second and third case are ALLOWED.

The measure of damages for misrepresentation (even in the absence of proof of intent to deceive) is the benefit of the bargain which the plaintiffs would have had if the representations had been true. *Robichaud v. Athol Credit Union*, 352 Mass. 351, 225 N.E.2d 347 (1967). In this case the damages are reduced by the eventual sales of the properties to others, and are in effect the same as the contract damages. As stated in the findings of fact the damages to Robert Gordon and Lola H. Jacobson, as successors to the Gordon corporation, are $4,977,258, and the damages to Dorothy Gordon and Lola H. Jacobson as executrices of the Estate of Maurice Gordon are $1,491,015.

It does not appear that Swerdlow made any of the false representations concerning the financing, or that he knew that they were false. Alida Realty, Inc. was a cipher in this whole transaction. It was Rokowsky's device rather than Rokowsky's princi-

pal. Accordingly, judgment shall enter for the defendants Alida Realty, Inc. and Swerdlow on Count 2 in cases No. C.A. 3259–S and C.A. 3260–S, without costs. Judgment shall enter for the plaintiffs against Isaac Rokowsky on Count 2 in the amount of $4,977,258 in case No. C.A. 3259–S and in the amount of $1,491,015 in case No. C.A. 3260–S, with interest from June 28, 1974 and costs in each case.