Isaac ROKOWSKY, et al., Plaintiffs,

v.

Robert GORDON, et al., Defendants.

Civ. A. Nos. 78–3316–S, 78–3259–S
and 78–3260–S.

United States District Court,
D. Massachusetts.

Jan. 18, 1982.

See also 501 F.Supp. 1114.

Barry I. Fredericks, Goldschmidt, Fredericks, Kurzman & Oshatz, Lewis A. Kaplan, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs.

Arthur M. Gilman and David G. Hanrahan, Gilman, McLaughlin & Hanrahan, Boston, Mass., for defendants.

## MEMORANDUM ON MOTION FOR NEW TRIAL AND OTHER RELIEF

SKINNER, District Judge.

These three consolidated cases arise out of an aborted agreement to sell commercial real estate in Massachusetts. In the first case, Rokowsky, one of the prospective purchasers, seeks to recover on a promissory note in the amount of $540,000 issued in the course of the deterioration of the transaction. In the second and third cases, Robert Gordon and his sister Lola H. Jacobson, owners of the beneficial interest in 26 of the 28 parcels to be sold, and the executrices of the estate of Maurice Gordon, which owned the other two parcels, claim damages for breach of contract against Alida Realty, Inc., the nominal purchaser, and its disclosed principals Isaac Rokowsky and Michael Swerdlow. By amendment, they also seek damages for fraud in the inducement of the agreement.

The motions to amend the complaint in the second and third cases were originally made on the sixth day of the nonjury trial. I denied them without prejudice. They were thereafter renewed at the close of the trial, and I took them under advisement. After reviewing the transcript of the trial, I determined that the issue of fraud in the inducement had been fully tried and allowed the motions to amend under Fed.R.Civ.P. 15(b). I then found for the plaintiff (the Gordons) on the added count in the aggregate of $6,468,273 against the defendant Rokowsky with interest from June 28, 1974.[1] 501 F.Supp. 1114 (1980).

Rokowsky now moves for a new trial in the second and third cases on four grounds:

1. The amendment deprived him of his right to a jury trial under the Seventh Amendment to the Constitution.

2. The amendment was not proper under Fed.R.Civ.P. 15(b).

3. An incorrect measure of damages was employed.

4. Interest on the award should not be allowed.

1. *Right to Jury Trial.*

In my opinion, the jury trial issue is subsumed under the issue of "express or implied consent", the prerequisite for a post-trial amendment under Fed.R.Civ.P. 15(b). If the defendant expressly or impliedly gave his consent to the trial of the issue of fraud in the inducement, it was in

---

1. I found for the defendants (the Gordons) in the first case.

the trial then going forward, that is, a nonjury trial. Both sides had waived a jury before trial and never mentioned a jury again until this present motion was filed. Accordingly, I reject the constitutional issue of trial by jury as a separate ground for a new trial and shall consider only the question of express or implied consent.

2. *Propriety of the Amendment Under Fed.R.Civ.P. 15(b).*

The test of consent to the trial of an issue appears to be whether a party permitted the introduction of evidence, without objection, or himself introduced evidence, which was relevant only to that issue. *Marston v. American Employers Insurance Co.,* 439 F.2d 1035, 1042 (1st Cir., 1971); *cf. Vargas v. McNamara,* 608 F.2d 15, 18 n.3 (1st Cir., 1979).

The particular issue was this: did Rokowsky enter into an agreement to buy real estate for $16 million cash plus assumption of existing mortgages at a time when he never intended to carry out the agreement, but intended from the very beginning to "negotiate" it down so that he need not provide any cash. There was considerable testimony, introduced by Rokowsky, concerning his ability to come up with the money, and the availability of cash from his backer, Mr. Freshwater. Most of this testimony revealed in fact that neither he nor Freshwater ever had the capacity to raise $16 million, that Rokowsky never made a serious effort to do so, and that he proceeded to try to renegotiate the contract very soon after it was executed. Arguably, most of that evidence was relevant to other issues.

There were two instances of evidence, however, one introduced without objection and one introduced by Rokowsky's own lawyer, which clearly related to the added issue and no other, and make it clear that much of the other evidence was understood by the parties to bear on this point. The first occurred during the cross-examination of Rokowsky by Atty. Gilman, counsel for the Gordons, at T. 3-48, 49.

Q  Now, as a matter of fact, your plan from the very beginning was never to come up with any cash at all of your own or Freshwater's, isn't that so? Can you answer that question?

A  No, that's not so.

Q  It's not so. And, in fact, sir—

A  I could come up with 600. [the $600,-000 deposit under the purchase and sale agreement]

It was a plain inference from this response that Rokowsky from the beginning intended the deposit to be his only contribution of cash.

The second occurred during the cross-examination of Robert Gordon by Attorney Suzman, one of Rokowsky's lawyers at T. 9-162, 163:

Q  And you testified this morning, you believed that Mr. Rokowsky was going to be able to come up with the money?

A  Yes.

Q  And you testified that you were told by Ryan Elliott that they had checked out Mr. Rokowsky?

A  Well, I don't know if I used the word "checked out".

Q  What did Ryan Elliott tell you?

A  Ryan Elliott were the brokers who brought us together, and based upon information that we received from Ryan Elliott sources, from attorneys, and from Mr. Swerdlow, Mr. Rokowsky, themselves, who they were, what business, how large they were, et cetera, I surely did believe they could come up with the money, because, I took this property off the market for over a year and tied everything up, based upon the fact they would come up with the money.

Q  What did Ryan Elliott tell you?

A  I don't remember.

Q  You don't recall, as we sit here today, what they told you?

A  Specifically, no.

This would appear on the face of it to have relevance only to the issue of reliance,

and to suggest very strongly that Rokowsky's attorneys were aware that the fraud issue had been introduced into the case. In particular, Mr. Gordon's statement about taking the property off the market in reliance on Rokowsky's representations was not challenged, although it was clearly unresponsive.

Later on, however, the following colloquy occurs, on which Rokowsky apparently relies to explain the foregoing, at T. 9–164, 165:

A  I didn't ask them where they got the money from. I mean, I was told—It would be kind of absurd for me to think otherwise. I entered into a deal with individuals, of course thinking they had the money to go through with the deal.

Q  Thinking it. I'm trying to find out whether you took any steps to check them out?

A  Yes.

MR. GILMAN: I'm going to object to this line of questioning.

THE COURT: What relevance does that have?

MR. SUZMAN: Let me go on with it, your Honor.

THE COURT: If you what?

MR. SUZMAN: If you permit me to go on with it?

THE COURT: No, tell me why.

MR. SUZMAN: The question of who he was dealing with, which is one of the issues in this case.

THE COURT: I didn't think there was any question about who he was dealing with. He was dealing with Rokowsky and Swerdlow.

MR. SUZMAN: I don't know that for a fact.

Notwithstanding the last colloquy, I am persuaded on a second review of the transcript, as I was on the first, that the issue of Rokowsky's fraudulent representation was in fact fully tried and inferentially recognized as an issue in the case by Rokowsky's attorneys.

The next inquiry concerns prejudice to the defendant because of the late allowance of the amendment. Rokowsky's attorney alleges two instances of prejudice:

First, he says that if he had known that the issue of fraud in the inducement were to be brought into the case, he would have introduced a release given by the Gordons to Rokowsky in connection with a parallel case in the state court (described at 501 F.Supp. 1121). The release is not a general release, however. The releasing language is as follows:

3.  RG, LJ and the Corporations hereby waive and relinquish any claim or right which they or each of them may have against IR or William F. Cowin or the firm of Friedman & Atherton for the bringing of the said suit or the filing of Lis Pendens in connection therewith including without limitation any claims for abuse or process or for malicious prosecution or otherwise.

Rokowsky submits an affidavit by *his* lawyer that the Gordons intended to give a general release by this document. Even if he were a competent witness, the release is not ambiguous and his testimony would not be allowed. The words "or otherwise" clearly refer to claims "for the bringing of said suit or the filing of *lis pendens*". This release would have availed him nothing in the present case.[2]

Second, Rokowsky claims that he would have conducted further discovery on the subject of the Gordons' reliance on Rokowsky's statements. In support of this assertion, he offers the transcript of a deposition of Attorney Ring in which Ring describes Robert Gordon during the contract negotiations as stating that Rokowsky was a phony and would never come up with the money. As pointed out, that line of inquiry was in fact pursued at trial. The overwhelming fact is that Gordon did indeed execute the purchase and sale contract by which he withdrew real estate worth over $30 million

---

2.  Furthermore, if it was a general release, it would have been a complete defense in the contract action against Rokowsky personally.

The attorney's claim that he was relying on the shield of the dummy corporation is not in the least credible.

from the market for four months, later extended an additional two months. It is not uncommon for a contractor to enter into a contract with doubts as to the other contracting party's capacity to perform. It strains belief, however, to assert that Gordon would have executed the contract if he had known that Rokowsky never intended to perform his end of the bargain. The fact of Gordon's execution of the contract raises a monumental presumption of reliance. There is, in my opinion, no substantial likelihood that it could have been overcome.

Accordingly, I find the assertions of prejudice to Rokowsky to be insubstantial, and no basis for denying the motions to amend or to grant a new trial on the issue of liability.

### 3. *Measure of Damages.*

Rokowsky attacks the award on two grounds: first, that the wrong measure of damages was used, and second, that the measure of damages was wrongly applied. The second issue being the simplest, I shall address it first. The measure of damages which I used was the Gordons' loss of the benefit of their bargain. I took the difference between the contract price and the price at which the Gordons eventually sold the property as representing the dollar value of damages. The eventual sale was in the summer of 1975. Rokowsky says the true measure is the difference between the contract price and the market value of the property in the fall of 1974 when Rokowsky failed to perform either the original or the proposed substitute purchase and sale agreement.

■ Rokowsky is correct in this respect, but in fact the eventual sale in 1975 is a measure of the value of the property in the fall of 1974 which is most favorable to Rokowsky. I have found that the Gordons were actively trying to sell the property from August 26, 1974 on. If there had been a market for the property at any better price than they sold it for in 1975, they would have sold it at that price. I conclude that there was no market in the fall of 1975 any higher than the price at which the property was sold in 1975. It may well be that there was no market at all in 1974, in

which case Rokowsky has had the advantage of the 1975 figure. I conclude that if loss of the benefit of the bargain was the proper measure of damages, the measure of damages was properly applied.

■ The general rule of damages in fraud cases under Massachusetts law is that the plaintiff is entitled to recover the benefit of his bargain. *Robichaud v. Athol Credit Union*, 352 Mass. 351, 225 N.E.2d 347 (1967). The defendant is correct in asserting that the rule may be varied in order to achieve a more just result. *Rice v. Price*, 340 Mass. 502, 164 N.E.2d 891 (1960). The cited case does not stand for the proposition, however, that it is ever error to apply the general rule. It is true that at one of the hearings in this case I stated that I would prefer to impose damages based on opportunity costs plus out-of-pocket expense, and so I would. It is also true that the benefit of the bargain rule produces a very large award which may not be the economic equivalent of the actual loss created by the defendant's fraud. On reflection, however, I conclude that opportunity cost could be developed only on evidence of the existence of an alternate market for the 28 commercial buildings involved in this case during the period February-August, 1974. Such a collection of real estate is rarely offered in wholesale lots, and reliable evidence of an alternate market or the lack of it would be difficult, if not impossible, to establish. As I read the Massachusetts cases, there is little justification for substituting such a speculative measure of damages for the reasonably certain one of loss of the benefit of the bargain.

If, as defendant suggests, however, there is some resolution of this matter which would lead to settlement of this controversy, I would be glad to confer with counsel and listen to any suggestions. In the meantime, my award of damages stands.

### 4. *Interest on the Award.*

■ After urging upon me a Massachusetts rule of damages, the defendant argues that the law of Florida should apply with respect to interest on the award. I will not belabor the anomaly of this position. In any case, I have treated the entire case as

being governed by the law of Massachusetts, and I shall do the same with regard to interest. The award of interest contained in my order of November 19, 1980 is erroneous. The true rule in Massachusetts is that in actions for deceit, and indeed in all tort actions other than those enumerated in M.G.L. c. 231, § 6B, interest runs from the time that damages are liquidated by award or verdict. *Connelly v. Fellsway Motor Mart, Inc.*, 270 Mass. 386, 170 N.E. 467 (1930); M.G.L. c. 235, § 8. Accordingly, interest shall run on the award only from November 19, 1980.

5. *Conclusion.*

The order for judgment of November 19, 1980 is amended to provide that interest shall run from November 19, 1980 rather than June 28, 1974, and the judgments entered December 1, 1980 shall be amended accordingly. The Motion for New Trial and Other Relief is otherwise DENIED.