CARLO BIANCHI & COMPANY, INC. *vs.* BUILDERS'
EQUIPMENT & SUPPLIES COMPANY
(and a companion case[1]).

Middlesex.   April 9, 1964. — June 16, 1964.

Present: SPALDING, WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Sale,* Conditional sale, Warranty, Rejection by buyer, Use of goods by buyer, Custom. *Contract,* What constitutes, Entire or divisible. *Evidence,* Extrinsic affecting writing. *Damages,* For breach of warranty. *Custom. Restitution. Practice, Civil,* Auditor: findings.

Where it was found that certain documents were not intended to set forth a complete statement of a conditional sale transaction, the parol evidence rule did not preclude consideration of a prior express warranty made orally by the seller.   [643–644]

A certain transaction, although in form a lease of equipment, was in substance a conditional sale thereof.   [644]

The sales act, G. L. c. 106, applied to a conditional sale.   [644]

Where it was found that a contractor having public contracts for laying concrete informed a dealer in equipment that he, the contractor, needed a concrete batching plant for such work, that the dealer suggested a very new kind of plant called a "Port-O-Matic," and that the contractor, relying on the dealer's judgment, contracted with him to buy the "Port-O-Matic," there was an implied warranty of fitness of the plant for the contractor's purposes under § 17 (1) of the sales act, G. L. c. 106, notwithstanding § 17 (4).   [644–645]

Under § 17 (6) of the sales act, G. L. c. 106, an express warranty by a seller of a concrete batching plant as to its production capacity did not negative an implied warranty of fitness of the plant for the buyer's purposes under § 17 (1).   [645]

In an action by a buyer against the seller of a concrete batching plant purchased for use by the buyer in laying concrete under public contracts and expressly warranted by the seller to be capable of producing

---

[1] The companion case is Builders' Equipment & Supplies Company *vs.* Carlo Bianchi & Company, Inc.

Carlo Bianchi & Co. Inc. *v.* Builders' Equipment & Supplies Co.

a certain quantity of batch at certain intervals during a working day, an assessment of damages by an auditor for breach of the warranty by reason of defects in the plant impairing its efficiency and delaying the contractor's work was not, on the record, open to successful attack as being purely conjectural.    [645–646]

A certain finding by an auditor whose findings were not final was not binding on the trier of facts at a subsequent trial where there was evidence warranting a finding contrary to such finding of the auditor. [646–647]

In the circumstances, the buyer in a conditional sale must be held not to have accepted under § 37 of the sales act, G. L. c. 106, a concrete batching plant which the buyer purchased for use in laying concrete pursuant to public contracts containing time limits for performance and which, although it never operated properly as warranted and for that reason was never paid for, the buyer continued to use in the performance of the public contracts until the performance thereof was completed, when the buyer expressly notified the seller that the buyer would not keep the plant.    [648–649]

A contract for sale of three pieces of equipment for use as a unit and for a single price was an entire, not a divisible, contract.    [649]

The buyer under an entire contract for sale for a single price of three pieces of equipment was not liable to pay for any of them where he properly rejected one of them for breach of warranty, although there was no complaint as to the other two and one of them remained on the buyer's premises.    [649–650]

Where a buyer of equipment, without paying the purchase price, used the equipment for some months in the performance of public contracts and then, for breach of warranty, rejected the equipment and recovered damages from the seller under § 58 (1) of the sales act, G. L. c. 106, the seller, although not entitled to the purchase price, was entitled to recover from the buyer in restitution the fair rental value of the equipment for the period it was used by the buyer.    [650]

A seller of equipment used for a time by the buyer and then justifiably rejected for breach of warranty in 1957 was not entitled to recover from the buyer the expense of repairing damage done to the equipment while in transit to the buyer, nor, in view of a custom, for services rendered in erecting the equipment, nor for the expense of dismantling and removing the equipment after its rejection by the buyer, nor for attorney's fees; the seller was entitled to recover from the buyer for repairing the equipment during the period of its use by the buyer in view of a provision of the parties' contract requiring the buyer to keep the equipment in "good repair, order and condition."    [651]

Two ACTIONS OF CONTRACT.   Writs in the Superior Court dated February 4, 1958, and May 1, 1959, respectively.

The actions were heard by *Spring,* J.

*Richard W. Renehan* for Builders' Equipment & Supplies Company.

*Daniel O. Mahoney* for Carlo Bianchi & Company, Inc.

REARDON, J.  These are two actions arising out of a contract for the rental or sale of a concrete batching plant, a track site unloader, and a clamshell bucket, entered into between a construction contractor, Carlo Bianchi & Company, Inc. (Bianchi) and a lessor and seller of construction equipment, Builders' Equipment & Supplies Company (Builders).

In the first case Bianchi, claiming special damages, sues for breach of express and implied warranties.  The second case is an action by Builders for rent due on the equipment, attorney's fees, services rendered, and expenses.  After consolidation for trial the cases were heard by an auditor whose findings of fact were not to be final.[2]  The auditor found breach of express and implied warranties and assessed damages for Bianchi at $28,017.23 plus $3,157.87 for a total of $31,175.10.  He also made findings on the value of rent, repairs, incidental expenses, and attorney's fees but left to the court the determination of Bianchi's liability for those items.  At a subsequent trial before a judge sitting without jury the evidence consisted of the auditor's report and certain other testimony, and there was a finding for Bianchi in the first case in the sum of $36,881.01 ($28,017.23 only plus interest) and one for Builders in the second case in the sum of $13,206.35.  The cases are here upon numerous exceptions by both parties to rulings of the trial judge.

The auditor found as follows.  Bianchi, a contractor with many years of experience, has engaged in a great deal of heavy construction on large projects, including work on concrete paving.  While Bianchi has handled "concrete on a large scale regularly for forty or fifty years . . . [it has] conducted concrete paving operations only as general contractor supervising a subcontractor, during the last twenty years or so.  This removal from direct contact with paving as a division of concrete operations was to some extent a cause of delay in synchronizing the work on the two jobs

---

[2] The actions were referred to the auditor on June 24, 1959, prior to the amendment of Rule 86 of the Superior Court which became effective July 1, 1961.

considered in . . . [these cases]." In the spring of 1957 Bianchi had two United States Government contracts for paving, one for about 12,000 cubic yards at Grenier Air Force Base at Manchester, New Hampshire (Grenier), and a second for about 10,000 cubic yards at Laurence G. Hanscom Field in Bedford, Massachusetts (Hanscom). Bianchi made inquiry through Fermo Bianchi, its treasurer, of one Mulkerin, vice-president of Builders, to determine whether an old batching plant which Bianchi owned "could be put in shape to operate under two Government contracts." Builders arranged for an examination of the old plant through one Brennet of Erie Strayer Company, a manufacturer of construction equipment, and submitted an estimate of cost by letter to Bianchi on April 9, 1957. On April 4 Brennet, who was northeastern district representative of Erie Strayer, called at Bianchi's office in company with one Harkins of Builders and talked with Peter Bianchi. Brennet, having informed Peter Bianchi that the cost of repairing the old plant "would not be reasonable," then "opened up the subject of Erie Strayer's new Port-O-Matic plant and in the conversation stated that . . . [this] plant would batch 34 cubic feet (1⅜ cubic yards) in . . . [forty-five] seconds. He stated that it had recording devices and would meet Government specifications."[3] Brennet thought delivery could be made in early June when Peter Bianchi stated he would need it. Brennet then showed Peter Bianchi a picture of the plant and enclosed with the letter to Bianchi of April 9, 1957, a list of its specifications.

On April 13 Brennet called again at the Bianchi office in company with one Kazanjian, the president of Builders, and saw Fermo Bianchi, who stressed the importance of early delivery "to meet a construction schedule to start the first week in June." Descriptive literature on the plant inclusive of pictures was left with Bianchi. On April 19 Kazanjian called Fermo Bianchi and said that a Port-O-Matic

---

[3] The auditor found "that Builders authorized and adopted the acts and statements of employees of Erie Strayer in assisting in negotiating the contract . . . ."

plant could be shipped by May 26 "if the order was placed promptly. [Fermo] Bianchi said he would place an order, but he wanted a penalty clause in the event there was delay in shipment . . . [and] wanted to arrange a time purchase plan, and a discount on the Port-O-Matic plant and the other machinery which Bianchi was buying from Builders. Kazanjian asked for a copy of the Government Specifications relating to batching concrete." These were sent to him. "Kazanjian sent a copy of the rental purchase form . . . to Bianchi on April 23 or 24 and placed the order for the Port-O-Matic plant with Erie Strayer on April 25. . . . On April 30, 1957, Bianchi gave Builders instructions on routing the shipment of the . . . plant."

"Late in May 1957, Builders prepared and sent to Bianchi *two* documents relating to the purchase and sale of the Port-O-Matic plant and other equipment" (emphasis supplied). One was entitled a "Rental Contract" (exhibit 13) and provided for "a guaranteed rental period of thirty (30) months" at a total of $1,809.60 a month for the three pieces of equipment. The other (exhibit 15) was typewritten, and in referring to the "Rental Contract" (and another rental contract not in issue here), granted Bianchi the option at any time during the life of the contract of remitting the unpaid balance and becoming the owner of the equipment. It contained certain other provisions relating to payment for the equipment, including one for a special discount on final payment. These documents, signed by Builders when received by Bianchi on May 29, 1957, were signed by Bianchi on June 4, 1957.

The selling prices of the several pieces of equipment subject to the negotiations were: (1) the Port-O-Matic plant, $47,680; (2) the track site unloader, $3,428; and (3) the clamshell bucket, $3,180, for a total of $54,288. The monthly rental of $1,809.60 was that total divided by thirty, representing the thirty months of guaranteed rent. There was never a dispute as to the operation of the track site unloader and the clamshell bucket.

The Port-O-Matic batching plant was a unit designed to aggregate together in stated quantities sand, two sizes of

stone, and dry cement. It contained scales and recording devices for regulating and tabulating the weight of the materials employed. Trucks delivered the dry mix to a dual drum paver which added water and completed the mixing of the concrete. The paver had a capacity for laying 1⅜ cubic yards of concrete on the paving strip every forty-five seconds. Without detailing the auditor's painstaking description of the entire process, it suffices to say a "paving operation is a highly mechanized, highly synchronized operation, which requires proper functioning and coördination of many machines and many persons in order to proceed without delays. . . . All of the operations from that of the paver on must be done within the time limits of the hardening of concrete."

The plant was shipped from Erie, Pennsylvania, on May 27, 1957, in accordance with Bianchi's instructions. Due to delay in shipment the main part did not arrive until June 13 and 14. On June 14 and 15 representatives from Erie Strayer came to Grenier to assist and supervise in the erection of the plant and to check over minor damage sustained in transit. Erection commenced on June 17 and consumed a week rather than the six to eight hours mentioned in the descriptive data. "It was found that the automatic weighing apparatus on the batching plant did not check out with actual weights on public scales. . . . On June 24, 1957, Bianchi complained to Builders about the delays and said Bianchi would not pay until the plant was operating properly." Further complaints in writing followed on June 27 and June 28.

Batching and paving eventually got under way on July 1, 1957. There was persistent and continuing trouble with the operation of the batcher. Production was spotty, and one Smock, an Erie Strayer man, came to Grenier on July 5 and remained until July 17. He lent his efforts to correcting a variety of disorders in the batcher and joined with Brennet in advising that "there should be an electrician on the job. No electrician was ever hired." On July 12 there was oral complaint from Bianchi at a conference attended by representatives of the parties and Erie Strayer.

Bianchi, from the last week of June until about July 15, endeavored to determine whether "a substitute batching plant could be purchased or rented" for the two contracts at Grenier and Hanscom. Its search was fruitless, as was an inquiry about the possibility of obtaining dry batches of aggregate from another supplier. A cement strike intervened and paving resumed after the strike on August 5, 1957. The plant continued to exhibit signs of temperament. The inspector for the Corps of Engineers finally lost confidence in the recording devices and insisted on checking weights by reading the scales. This procedure produced time lags. At long last, on September 4, 1957, the paving operation was concluded at Grenier after six five-day weeks as against the four weeks which Bianchi had estimated would be required. The plant was then moved to Hanscom with Smock again called in to "connect and adjust the scales, recorders and electronic controls." At Hanscom the operation was somewhat more satisfactory and lasted from September 17, 1957, until October 14, 1957. There were, however, difficulties. Upon completion of the paving at Hanscom, Bianchi orally and in writing "notified Builders that it would not keep the batching plant, and asked Builders where it should be stored. Builders suggested it could be stored in Builders' yard in Medford." Bianchi later wrote to Builders on October 24, 1957, that the plant could remain at Hanscom for a month or two. Bianchi's generator remained connected to the plant and Builders demonstrated it to a prospective customer at Hanscom. There was no further action on rental or sale of the plant. Oral and written complaints by Bianchi to Builders were made from June 24, 1957, to October 15, 1957. Bianchi permitted another contractor to use the plant at Hanscom for a few days.

In June, 1958, Builders removed the batching plant to its yard after a letter had gone from its attorneys to Bianchi reserving its rights in a number of respects. The track site unloader was moved from Hanscom to Bianchi's yard in Framingham, and was later rented by Builders to Bianchi

for a job in Windsor Locks, Connecticut, under a separate rental agreement. It was eventually returned to Builders' Medford yard on December 10, 1958. The clamshell bucket has not as yet been returned by Bianchi.

## THE FIRST CASE.

1. The auditor found that exhibits 13 and 15 were not intended by the parties as an integration of their agreement but rather as memoranda of what had previously been orally decided. If the writings are an integration, then the prior oral warranty by Builders that the Port-O-Matic would produce a 1⅜ cubic yard batch every forty-five seconds would not be admissible under the parol evidence rule. *Freeman* v. *Sieve,* 323 Mass. 652, 654. But "[b]efore the parol evidence rule comes into operation 'the court must be sure that it has before it a written contract intended by the parties as a statement of their complete agreement.' *Kesslen Shoe Co. Inc.* v. *Philadelphia Fire & Marine Ins. Co.* 295 Mass. 123, 129." *Kelley* v. *Arnold,* 326 Mass. 611, 615. See Restatement: Contracts, § 228. Whether a writing embodies an agreement or serves simply as a memorandum is a question of fact (*Peerless Petticoat Co.* v. *Colpak-Van Costume Co.* 273 Mass. 289, 292) and, therefore, the auditor's finding in this regard, based as it is in part on unreported evidence, is not open to our review. Nonetheless we note that exhibit 15 is concerned solely with the method of payment for the pieces of equipment and that exhibit 13, a standard printed "Rental Contract," sets out briefly that the named equipment is leased "for a guaranteed rental period of thirty (30) months" at $1,809.60 a month, with Bianchi to carry appropriate insurance. Four printed paragraphs of "Standard Rental Terms and Conditions" complete the "Contract." There is no integration clause and no mention of any warranties. In *Glackin* v. *Bennett,* 226 Mass. 316, relied on by Builders, where at issue was the admissibility of an oral warranty, the written agreement demonstrated on its face that it included the whole agreement of the parties and all that was necessary to constitute

a contract. The writing itself contained an express warranty. It was there said at page 319: "When it is apparent that the writing contains only a part of the agreement and does not purport to set forth all its terms, or when it is a reasonable inference that it was not intended to be a full and final statement of the entire transaction, the existence of a separate agreement, not inconsistent with its terms and relating to some subject on which the written instrument is silent, may be shown by parol." It follows that Builders' oral representation was properly admitted by the auditor. Compare *Frick Co.* v. *New England Insulation Co., ante,* 461.

2. We must next decide whether the transaction between the parties is governed by the sales act, G. L. c. 106, §§ 1–65, repealed effective October 1, 1958,[4] by St. 1957, c. 765, § 1, and replaced by the Uniform Commercial Code. Although the written memoranda are in the form of a lease, the transaction was in substance a conditional sale. Bianchi, by guaranteeing to hire the equipment for thirty months, was obligated to pay exactly the purchase price as set out in exhibit 15. The rental was determined by dividing the purchase price into thirty equal parts. See *Hurnanen* v. *Nicksa,* 228 Mass. 346; *Giligian* v. *New England Truck Co.* 265 Mass. 51. Compare *DaRocha* v. *Macomber,* 330 Mass. 611, 615. The sales act applies to contracts of conditional sale. *Denenberg* v. *Jurad,* 300 Mass. 488, 492.

3. The auditor justifiably found "that the contract between the parties contained an express warranty that the batching plant would produce a 1⅜ cubic yard batch every . . . [forty-five seconds]." G. L. c. 106, § 14. He found also that incident to the express warranty was an implied warranty that production on a forty-five second interval would continue throughout an eight hour day. "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or

[4] All events at issue occurred prior to October 1, 1958.

not, there is an implied warranty that the goods shall be reasonably fit for such purpose." G. L. c. 106, § 17 (1). But "[i]n the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose." G. L. c. 106, § 17 (4).

The auditor found specifically that Bianchi informed Builders that the batching plant "was needed . . . for laying strips of concrete paving for two Government jobs"; that Bianchi relied on Builders' judgment in buying a new type of equipment; that Brennet of Erie Strayer in the presence of Harkins of Builders first suggested the Port-O-Matic unit; that the plant and the name "Port-O-Matic" were "so new that only one other machine had ever been made before, a demonstration model for an exhibition in Chicago, and no other machine was in operation in the United States." It has been held that § 17 (4) does not apply where the purchaser of an article for a communicated purpose relies on the seller to supply something suitable for that purpose and the seller recommends and sells an article having a trade name. *Ireland* v. *Louis K. Liggett Co.* 243 Mass. 243, 247. The circumstances relating to the recommendation of the Port-O-Matic to Bianchi compel the conclusion that Erie Strayer's recommendation was also that of Builders.

We may note in passing that Bianchi has the benefit of both the express and the implied warranty. "An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith." G. L. c. 106, § 17 (6).

4. The auditor found that defects in the plant caused it to fail to perform as warranted at the rate of a 1⅜ cubic yard batch every forty-five seconds[5] over a regular work

---

[5] At one point the auditor wrote: "I find that the failure at times to produce batches at . . . [forty-five]-second intervals did not constitute a violation of the express warranty." Builders interprets the sentence to mean there was never any breach of the express warranty. Read in context, however, it is clear that the auditor meant that there was no breach on those occasions when Bianchi's own inefficiency was the cause of the failure to produce at the warranted interval.

day.   In assessing damages he had to separate the loss of
efficiency attributable to the breach of warranty from that
attributable to Bianchi.   Noting that "[a] reasonable ap-
proximation becomes necessary," the auditor found that
"but for the defects in the batching plant, which constituted
a breach of the implied warranty of fitness, Bianchi could
have placed concrete on the days of operation under its gov-
ernment contracts at the rate of 533 cubic yards per day."
He found that "[t]he difference between 533 cubic yards
per eight hour day and 880 cubic yards which would have
been produced and laid in an eight-hour day if 1⅜ cubic
yards had been produced and laid every . . . [forty-five]
seconds" represented delays and loss of efficiency assignable
to causes other than malfunctioning of the batching plant.
The difference then between 533 cubic yards and the amount
actually batched and placed each day represented the loss
of efficiency caused solely by breach of warranty.   The
auditor found damages resulting from this loss of efficiency
to be in the sum of $28,017.23 on the work done by Bianchi
at Grenier and Hanscom.   Builders assails the figure as
unsupported by the evidence and purely conjectural.   But
we cannot say as a matter of law that he could find no dam-
ages in these circumstances.   "[T]he fact that there is an
element of uncertainty in their assessment is not a bar to
recovery . . ..   'The amount of damages seldom can be
proved with the exactness of mathematical demonstration.
Much must be left to estimate and judgment, sometimes
upon meager evidence.'   *Piper* v. *Childs,* 290 Mass. 560,
563."   *Dalton* v. *Demos Bros. Gen. Contractors, Inc.* 334
Mass. 377, 378–379.   *Agoos Leather Cos. Inc.* v. *American
& Foreign Ins. Co.* 342 Mass. 603, 608.

5.   The auditor found that Bianchi had sustained addi-
tional damages amounting to $3,157.87 for the week ending
June 29, 1957, because of the failure of the batching plant
to make sufficiently accurate weighings and recordings to
permit paving operations to begin that week.   At the trial
a Colonel Carlson of the Army Corps of Engineers testified
that "it was his recollection that the batching plant was

ready to operate the day the contractor declared that he was ready to pave . . . ." The judge rejected this element of damages. The finding by the auditor was binding upon the judge only until there was additional evidence before him which would warrant a contrary conclusion. *Cook* v. *Farm Serv. Stores, Inc.* 301 Mass. 564, 566. *Kelleher* v. *Farrell,* 339 Mass. 756, 758. The testimony of Colonel Carlson did justify such a contrary conclusion.

6. There is no error in the disposition of the first case.

## The Second Case.

1. In the second case Builders is suing Bianchi on the basis that the so called "Rental Contract" provided "for a guaranteed rental period of thirty (30) months" at $1,809.60 a month. An action for rent at that rate is alleged for the period from June 3, 1957, to the date of the writ. We first consider two pertinent sections of the sales act. General Laws c. 106, § 13 (2), reads: "Where the property in the goods has not passed, the buyer may treat the fulfilment by the seller of his obligation to furnish goods . . . as warranted expressly or by implication in the contract to sell as a condition of the obligation of the buyer to perform his promise to accept and pay for the goods." Bianchi clearly had a right both to " [r]efuse to accept the goods" and to recover damages for breach of warranty.[6] The second section is G. L. c. 106, § 37: "The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him and he does any act in relation thereto which is inconsistent with the seller's ownership, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them." Exhibit 13, the "Rental Contract," provides that title to the equipment "at all times" was to remain in Builders.

---

[6] "If there is a breach of warranty by the seller, the buyer may, at his election . . . (c) Refuse to accept the goods, if the property therein has not passed, and maintain an action against the seller for damages for such breach." G. L. c. 106, § 58 (1).

We are confronted with the question whether Bianchi's conduct constituted an acceptance of the batching plant. We summarize the auditor's relevant findings. Bianchi discovered soon after its arrival that the plant was not operating properly and on June 24, 1957, notified Builders that no payments would be made until it was. The plant never performed as warranted during the period of use. No payments were ever subsequently made by Bianchi. Bianchi seasonably notified Builders of the breach of warranty and complained of it a number of different times during the period of usage on the government contracts. "Throughout the period of use and more particularly during the first few weeks, both parties were actively concerned with making changes and repairs and looking after maintenance in the hope and expectation that the plant would perform as warranted. . . . The expectation and substantial realization of improvement in performance kept alive Bianchi's hope of further improvement and justified continuing use of the machine, particularly in the performance of Bianchi's Government contracts subject to time limits. . . . Bianchi was under contract obligation on the [G]overnment contracts . . . to complete its concrete paving operations during the 1957 work season. . . . Bianchi made reasonable efforts to obtain a substitute batching plant or an alternative source of supply of dry batches and was informed that neither was available. . . . [Had] Bianchi failed to continue use of the batching plant, it would have defaulted on its [government] contracts . . . ." After paving had been completed at Hanscom, Builders was notified that Bianchi did not intend to keep the plant.

Continued use of the seller's goods by the buyer, if unexplained, would constitute an acceptance by the buyer under G. L. c. 106, § 37. See *Babcock Coal Co.* v. *Boston,* 303 Mass. 518, 521. In these circumstances, however, use did not reasonably signify an acceptance; that is, an intimation that Bianchi was sufficiently satisfied with the plant to consent to become its owner. Rather, use during the period when both parties were concerned with improving the plant

signified only that the buyer would accept it if the attempted improvements proved efficacious. See *Greeff Engr. & Mfg. Co.* v. *Scourene Mfg. Co.* 182 App. Div. (N. Y.) 311, 316; *Kusnitz* v. *Hillary Furniture, Ltd.* 134 N. Y. S. 2d 699, 700–703 (Mun. Ct. N. Y.); *Kaminsky* v. *Levine,* 106 Pa. Super. Ct. 278, 281. It follows that Bianchi's rejection after completion of the government contracts was seasonable. This conclusion is reinforced by the other circumstances cited by the auditor. As has been noted, reasonable efforts were made to procure another batching plant or "an alternative source of supply of dry batches." Bianchi might reasonably have determined that damages assessable to Builders would be decreased if the batching plant were used rather than rejected. Such an outright rejection would have produced a complete default by Bianchi on the paving contracts with ensuing liability on Builders for lost profits and other damages.[7] In the light of these considerations we hold that Bianchi rejected the batching plant.

2. The contract to sell the plant, the track site unloader, and the clamshell bucket was, in our opinion, entire and not divisible. All were covered in one total price set forth in exhibit 15. The items were to be used as a unit and the natural intendment of the parties was that Bianchi should not be liable on the contract for any of them if one were properly rejected. *Hart-Parr Co.* v. *Duncan,* 75 Okla. 59, 60, 63–64. See *Fullam* v. *Wright & Colton Wire Cloth Co.* 196 Mass. 474, 476–478; *National Wholesale Grocery Co. Inc.* v. *Mann,* 251 Mass. 238, 249; *Bianchi Bros. Inc.* v. *Gendron,* 292 Mass. 438, 443–444; Williston on Contracts (3d ed.) § 862. We therefore hold that Bianchi is not liable in contract to pay the purchase price of any of the three pieces of equipment. The fact that the clamshell bucket, about

---

[7] Permitting the use of the batching plant by another contractor "for a few days more on the . . . [Hanscom] job" is some indication of acceptance by Bianchi. Such a conclusion, however, is contravened by indications that Builders may have accepted Bianchi's rejection (1) by advising Bianchi that the plant could be returned to Builders' yard in Medford and (2) by demonstrating it to a prospective customer at Hanscom presumably after receiving a letter from Bianchi dated October 24, 1957, that the "machine could remain where it was . . . for a time and Bianchi's generator would remain connected up so that Builders could demonstrate the plant to customers."

the operation of which there was no complaint from Bianchi, is still stored in Bianchi's yard is not, in our opinion, of consequence in this determination. It is of some consequence, however, that the track site unloader, which operated properly, was subsequently rented for a period of two months by a separate agreement between the parties and employed on work at Windsor Locks, Connecticut, by Bianchi.

3. While Bianchi is not liable on the contract to pay for the construction equipment, Builders, although itself in default, is entitled to recover in restitution an amount equal to a fair rental value for the period of use by Bianchi. Builders' failure to perform was not deliberate. Bianchi has already been made whole for the failure of the batching plant to perform as warranted; to deny recovery to Builders for rent would be in effect to give to Bianchi free of charge the use of equipment which complied fully with all warranties. Without question Builders' part performance has benefited Bianchi. Williston on Contracts (Rev. ed.) § 1473. Corbin on Contracts, §§ 1122, 1124. Restatement: Contracts, § 357. See *Amtorg Trading Corp.* v. *Miehle Printing Press & Mfg. Co.* 206 F. 2d 103, 105–106 (2d Cir.).

The judge found for Builders in the amount of $13,206.35. Builders is suing (1) for rental to the date of the writ, (2) for repairs made of damage to the plant while in transit to Bianchi ($180.22), (3) for services rendered in erecting the plant at Grenier ($3,172.18), (4) for repairs to the plant made at Hanscom ($144.32), (5) for expenses of dismantling and removing the plant to its own premises ($1,692.00), and (6) for attorney's fees. We are unable to ascertain upon what basis the judge assessed damages of $13,206.35. Thus we must remand the second case to the Superior Court for a determination as to the fair rental value of the equipment from June 14, 1957,[8] when delivery

---

[8] We look to the written memoranda to ascertain the intention of the parties with regard to when rental was to begin. The relevant provision is that "[a]ll rentals start and include the day each item of equipment leaves . . . [Builders'] yard . . . ." The equipment was not shipped from Builders' yard but rather from Erie, Pennsylvania, direct to Bianchi. The last portion of the batching plant arrived at Grenier on June 14, 1957.

to Bianchi was completed, until late in October, 1957, when Bianchi ceased using the equipment after having communicated a rejection of it.

Builders may also recover $144.32 for repairs performed on the batching plant at Hanscom on October 11, 1957. The "Rental Contract" provided that Bianchi should keep all equipment in "good repair, order and condition," and the repairs performed on that day appear related more to normal wear and tear than to breach of warranty. The $180.22 for damages in transit must be borne by Builders because "[u]nless otherwise agreed, the goods remain at the seller's risk until the property therein passes to the buyer . . . ." G. L. c. 106, § 24. Builders may not recover for services rendered in erecting the plant because the auditor found a practice in the trade "that these services are provided by the manufacturer's representative [Builders] at no cost to the buyer." See G. L. c. 106, § 60. The expenses of dismantling and removing the batching plant must also be borne by Builders because when goods are rightly rejected by the buyer, "he is not bound to return them to the seller . . . ." G. L. c. 106, § 39. Builders may not rely on an arguably contrary provision in the written memoranda when it has committed a breach of the contract of sale. See *Bryne* v. *Dorey,* 221 Mass. 399, 403–404; Williston on Contracts (3d ed.) § 813. By the same token the amount found to be fair and reasonable charges for attorney's fees in view of the breach of warranty by Builders is not recoverable.

### Conclusion.

In the first case the exceptions of both parties taken to the general finding of $36,881.01 are overruled. All other exceptions taken by both fail to show reversible error and are therefore overruled. In the second case the exceptions relating to the finding of $13,206.35 are sustained. All other material exceptions taken by both parties in that case have been treated by the discussion in the opinion.

*The first case: Exceptions overruled.*
*The second case: Exceptions sustained.*