JOHN D. RYDER, executor, & others[1] *vs.* WAYNE WILLIAMS
                        & another.[2]

                          No. 89-P-434.

              Plymouth. May 21, 1990. - August 20, 1990.

            Present: WARNER, C.J., DREBEN, & PORADA, JJ.

*Evidence*, Extrinsic affecting writing, Parol evidence. *Contract*, Construc-
   tion of contract.

At the trial of an action on three promissory notes, brought by the execu-
   tors of the estate of the lender, the judge was warranted in concluding
   that the parol evidence rule did not preclude the borrowers from intro-
   ducing evidence of an additional oral agreement that, in the event the
   lender died, the borrowers would have no obligation to continue pay-
   ments on the notes to the lender's estate, where the judge was war-
   ranted in determining, as a preliminary matter, that the notes did not
   reflect an integrated agreement. [149-150]
At the trial of an action on three promissory notes, brought by the execu-
   tors of the estate of the lender, the evidence was sufficient to support
   the jury's finding that the lender intended and agreed at the time of
   execution of the notes, as did the borrowers, that payments were to be
   made on the notes only during his lifetime, or until such earlier time as
   the notes were fully paid. [151]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 19, 1984.

The case was tried before *George Jacobs*, J.

*James P. Devlin* for the plaintiffs.

*Claudia Billings McKelway*, for the defendants, submitted
a brief.

DREBEN, J. Three promissory notes, set forth in full in the
appendix to this opinion, were executed in September, 1978,
each providing for monthly payments and stating the period

---

[1]Anna Marie Little and Anders Martenson, Jr., co-executors of the
estate of Howard W. Maxim.
[2]Dimitria Williams.

of time needed to pay off the note. The question before us is whether the trial judge erred in holding that the parol evidence rule did not preclude the defendant borrowers (Wayne and Dimitria Williams) from introducing evidence of an additional agreement that, in the event the lender (Howard Maxim) died, the borrowers would have no obligation to continue payments on the notes to Maxim's estate. We hold the parol evidence rule inapplicable and the evidence admissible because the judge was warranted in determining, as a preliminary matter, that the notes did not reflect an integrated agreement.

Prior to the jury's hearing of testimony, the plaintiffs, executors of Howard Maxim's estate, who had brought this action on the notes, filed a motion in limine seeking exclusion of Maxim's statements at the time of the execution of the notes. Those statements were to the effect that, if he could pick the day to die, he "would take care of it," meaning (so the defendants claim) he would tear the notes up.

The judge held a voir dire at which Wayne Williams was the only witness. He testified that in September, 1978, he entered into an agreement with Howard Maxim which was part written and part oral, that the notes were the written part, that, between the signing of the first and last note, Maxim stated that "he would do away [with] or tear up the papers if it was possible before his death," that "these papers don't really mean anything, anyway, if I knew something was going to happen to me we would do away with them." Based on this testimony, the judge denied the motion in limine, saying, "The parties, so far as I could tell from the evidence, did not intend to integrate the oral statement into the written documents; therefore, . . . the parol evidence rule does not operate to make the statements inadmissible."

The matter was then tried to a jury who were warranted in finding the following facts. In the early 1960's, Howard Maxim befriended Dimitria Williams and her husband Wayne Williams. The trio developed a close relationship and often socialized together. Maxim, who was childless and thirty-five years Wayne's senior, ran a well-drilling company.

He encouraged Wayne to enter the business, and, although Wayne declined to buy Maxim's company in 1970, Maxim ultimately helped Wayne start his own. In 1977, Maxim wrote a $50,000 check for the purchase of Wayne's first rotary rig, and in 1978 Maxim lent Wayne an additional sum of $80,000 to upgrade his well-drilling equipment.

Maxim drafted three promissory notes of $50,000, $80,000, and $46,864.80 (see appendix), the last of these representing interest on the $80,000 note. On September 12, 1978, Maxim and the Williamses signed the notes at Maxim's home.[3]

At trial, Wayne repeated his testimony at the voir dire concerning the statements made by Maxim, adding "that it was not intended for me to pay it — to continue it on to the estate." Dimitria Williams testified that, at Maxim's death, "he wanted us not to pay any more, that debt would be free and clear from there."

Wayne also testified that Maxim had deliberately written the notes in an unconventional way and had told Wayne, "Two of them says I owe you the money, one of them says you owe me the money." Williams stated that it was his understanding that the notes were so written because Maxim wanted to forgive the balance of the notes at his death, and that Maxim had explained that the notes were written in that manner "in case things don't work out." At Maxim's death, the Williamses stopped making payments on the notes.

Both Wayne and Dimitria Williams testified that, on numerous occasions subsequent to the signing of the notes, Maxim reiterated his comments to the effect that, if he knew when he was going to die, he would tear up the notes. Maxim also told his secretary and long-time friend Virginia Riemels (Riemels) that if he knew when he was going to die, he would tear up the notes. The night before Maxim died in

---

[3]The note for $50,000 was dated May 17, 1977. It appears, however, from Wayne's testimony and the similarity of the notes and the ink color of signatures, that the three notes were signed at the same time in September, 1978.

1982, he summoned Riemels and instructed her, in the event of his death, to go to his house, to enter using a hidden spare key (Riemels knew its location), and to tear up all the notes in his box. When Riemels went to Maxim's house the morning after his death, the doors were locked and the spare key was not in its hiding place. She could not retrieve the notes.

Both the plaintiffs and the defendants moved unsuccessfully for directed verdicts at the conclusion of the evidence. The primary question before the jury was whether the agreement between the parties included a provision excusing the outstanding balance on the notes on the occasion of Maxim's death based on an oral understanding with Maxim.[4] The jury found for the defendants. The plaintiffs moved for judgment notwithstanding the verdict or, alternatively, a new trial. The motion was denied.

In their appeal, the plaintiffs claim that the jury finding was based on evidence which does violence to the parol evidence rule since the notes contain no provision relating to Maxim's death.[5] But, as indicated in *New England Factors, Inc.* v. *Genstil*, 322 Mass. 36, 40 (1947), quoting from *Kesslen Shoe Co.* v. *Philadelphia Fire & Marine Ins. Co.*, 295 Mass. 123, 129 (1936), "before that rule comes into operation 'the court must be sure that it has before it a written contract intended by the parties as a statement of their complete agreement.' " If not, the rule is inapplicable.

1. *Preliminary finding by the judge.* For purposes of this preliminary determination by the judge — a factual one, *Wang Labs., Inc.* v. *Docktor Pet Centers, Inc.*, 12 Mass. App. Ct. 213, 219 (1981) — the parties may present proof beyond the writing itself, including evidence of prior negotiations. *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847,

---

[4]At the time of Maxim's death, the Williamses had paid $29,500 on the $50,000 note; $29,333.48 on the $80,000 note; and $17,183.78 on the $46,864.80 note.

[5]The cases cited by the plaintiffs, *Trahant* v. *Perry*, 253 Mass. 486 (1925), *Dodge* v. *Bowen*, 264 Mass. 208 (1928), and *Quincy Trust Co.* v. *Woodbury*, 299 Mass. 565 (1938), unlike the present case, involve negotiable notes. See G. L. c. 106, § 3-104(1)(*d*). Different policy considerations may apply to such notes. See 3 Corbin, Contracts § 587, at 518 (1960).

849 (1973). *Alexander* v. *Snell*, 12 Mass. App. Ct. 323, 324 (1981). *Fred S. James & Co. of New England, Inc.* v. *Hoffmann*, 24 Mass. App. Ct. 160, 163 (1987). Restatement (Second) of Contracts § 209(2), § 210(3), and § 214(a) & (b) (1981). 3 Corbin, Contracts § 588 (1960). In *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. at 850, involving a contract for the purchase and sale of 150,000 yards of fill at a certain price, evidence of an oral agreement that the buyer's obligation would end if the city of Brockton found the fill unacceptable was admissible to show whether the parties intended an integrated contract. Justice Kaplan, writing for the court, found that the evidence (in view of the brevity of the writing and the evident design to mesh the agreement with a certain Brockton job) could justify a preliminary finding that the agreement was not integrated.

Similarly, as a preliminary matter, the evidence in the case at bar, especially in view of the brevity and unusual form of the notes, could justify the judge's finding that the parties' contract was not integrated — that the notes did not reflect the parties' entire agreement.[6] "The conclusion of nonintegration is quite plausible" even if the termination of the Williamses' obligation on Maxim's death is viewed as "a condition added to" the contract. See *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. at 850 & n.3. The judge could well find that the parties did not intend to exclude an oral agreement on the subject of what was to happen on Maxim's death, and, considered in that light, the additional term sought to be proved by the defendants was consistent with the notes as written.[7]

---

[6] In addition to the reversal of the obligor in two of the notes and the signing of the note by Maxim as well as the Williamses, the execution of a separate note for interest is not conventional.

The trial judge also allowed testimony as to Maxim's statements on the additional ground that the notes were ambiguous. We do not consider this additional reason for the admission of Maxim's statements.

[7] See Liacos, Massachusetts Evidence 388-389 (5th ed. 1981), *indicating* that borderline cases present difficulties. The test suggested in the text is: "Does the agreement as to which evidence is offered deal with the same subject matter as the subsequent or contemporaneous agreement that is alleged to integrate or merge it?"

2. *Jury finding.* Contrary to the plaintiffs' contention, the jury could infer from Maxim's statements, made both at the time of the execution of the notes and thereafter, from his statements explaining the unusual form of the notes, and from his conversation and instructions to Riemels that Maxim intended and agreed at the time of the execution of the notes, as did the Williamses, that payments were to be made on the notes only during his lifetime, or until such earlier time as they were fully paid.

*Judgment affirmed.*

*Order denying motion for judgment n.o.v. or for a new trial affirmed.*