**TOWN & COUNTRY FINE JEWELRY GROUP, INC., Plaintiff,**

v.

**Lawrence D. HIRSCH, Defendant.**

**Lawrence D. HIRSCH, Counter-plaintiff,**

v.

**TOWN & COUNTRY CORP. and Town & Country Fine Jewelry Group, Inc., Counter-defendant.**

**Civ. A. No. 93–11369–NG.**

United States District Court, D. Massachusetts.

Oct. 12, 1994.

Marjorie S. Cooke, Barbara Gruenthal, Cooke & Associates, Boston, MA, for Town & Country Fine Jewelry Group, Inc.

M. Ellen Carpenter, Kern, Hagerty, Roach & Carpenter, Boston, MA, Michael J. Salvi, Peter J. Wifler, Salvi, Salvi & Wifler, Lake Zurich, IL, for Lawrence D. Hirsch.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

This case stems from a dispute between Lawrence D. Hirsch ("Hirsch"), his former employer, Town & Country Fine Jewelry Group, Inc. ("T & C Group"), and its corporate parent, Town & Country Corporation ("T & C Corp.") (collectively "T & C"), in the aftermath of Mr. Hirsch's resignation from employment in March, 1993. Prior to 1993, Mr. Hirsch had been a long-term employee of T & C, having started as a sales representative with a predecessor firm in 1988. At the time of his resignation, he was a vice president of sales, supervising accounts worth well in excess of $1,000,000 in annual sales. In March, 1993 however, Mr. Hirsch abruptly announced his intent to leave his position at T & C. Shortly thereafter he commenced employment with one of T & C's competitors. On June 21, 1993, T & C Group commenced this four-count action against Mr. Hirsch.

Count I seeks a judgment declaring that claims by Mr. Hirsch for unpaid sales commissions, totalling in excess of $400,000, are invalid. Counts II (requesting recision of contract), III (fraud) and IV (unjust enrichment) relate to a $25,000 debt, owed by Mr. Hirsch to T & C Group, which T & C Group forgave in March 1993. T & C Group alleges that the debt forgiveness was obtained by Mr. Hirsch as a result of his intentional misrepresentations to T & C Group, and seeks an order rescinding that forgiveness and a judgment for the amount of the debt.

On August 2, 1993, Mr. Hirsch filed a counterclaim against T & C Group and T & C Corp. for the unpaid commissions; on May 5, 1994, Mr. Hirsch moved for partial summary judgment with respect to Counts II, III and IV.

For the reasons stated below, Hirsch's Motion for Partial Summary Judgment is **DENIED.**

## II. FACTS

The following facts, relevant to Counts II, III and IV, are not in dispute. In October, 1988, Mr. Hirsch was hired as a jewelry sales representative for Feature Enterprises, Inc. ("Feature"). In December, 1988, Feature was purchased by T & C Corp., and eventually became a subsidiary of T & C Group. During the entire period from October, 1988 through March, 1993, Mr. Hirsch was employed in various sales capacities by Feature and/or T & C Group. On or about March 24, 1992, Mr. Hirsch borrowed $25,000 from Verilyte Gold, Inc. ("Verilyte"), a subsidiary of T & C Corp., which is now a division of T & C Group. Mr. Hirsch executed a loan note memorializing this debt.

In January, 1992, Mr. Hirsch was given the title of vice president of sales. In May, 1992, he was given added responsibilities for the "Zale/Gordon" account, which had previously been handled by other members of the sales staff. In late 1992, Mr. Hirsch held discussions with Basil Haymann, who was then the President of T & C Group, concerning his heavy workload and his desire for additional compensation. According to Haymann, Hirsch repeatedly emphasized that he was "committed to Town & Country, was loyal to Town & Country and that he saw himself as a 'long term player' at Town & Country." Among Hirsch's requests was that the $25,000 loan be forgiven.

Haymann stated that, at the time of Hirsch's request, a number of his salespersons had recently resigned, and that he therefore had a particular interest in keeping Mr. Hirsch on-board to stabilize his sales force. Accordingly, Haymann agreed to forgive Hirsch's obligation to repay the $25,000 loan and to give him a bonus for the then current fiscal year (ending February 28, 1993). Haymann also agreed to increase Hirsch's salary and provide him with a guaranteed bonus for fiscal year 1994. According to Haymann, all of these accommodations to Mr. Hirsch were induced by Mr. Hirsch's statement that he was committed to stay at T & C.

As a result of these discussions, on December 15, 1992, Mr. Haymann drafted a memorandum addressed to Mr. Hirsch ("the December 15 memorandum"). The "Subject" of the memorandum is "Compensation Pack-

age" and it begins with a preface which reads as follows:

We have had several discussions over the last few weeks concerning your future with the Town & Country Fine Jewelry Group. These talks have been very productive and I feel that you now have an absolute confirmation of your importance going forward and of the role that you will be playing. This memo will serve to clarify the financial parameters for both FY93 (current year) and FY1994.

The remainder of the memorandum consists of two parts, entitled "Part I: FY93 Compensation" and "Part II: FY94 Compensation." Part I states that Mr. Hirsch will receive a base salary of $150,000 per annum through February 28, 1993. In addition, it states that he will receive a "President's Bonus" of $35,000 in March of 1993. Finally, Part I refers to the $25,000 note Mr. Hirsch had given to T & C, and states that "Provided you are still employed by the Town & Country Fine Jewelry Group through the entire FY94 period, I will cancel this note and forgive your indebtedness on this $25,000 as of 2/28/94."

Part II of the memorandum describes Mr. Hirsch's compensation package for the fiscal year starting on March 1, 1993. Under the terms of Part II, Mr. Hirsch's salary was to increase to $185,000 per annum. If he were to continue to work through February 28, 1994, he would receive an incentive bonus. He would also receive the services of an assistant, to be hired by T & C.

After receiving the December 15 memorandum, Mr. Hirsch spoke with Basil Cohen, an Executive Vice President of T & C Group, to complain about its contents. Mr. Hirsch objected to the date on which the $25,000 debt was to be forgiven. He stated that he told Mr. Cohen that it was his understanding of the agreement that the debt was to be forgiven in February, 1993, not 1994 as the memorandum had indicated. He stated that he told Mr. Cohen, words to the effect of "I hope Basil Haymann is not going to add this extra year on and hold this note as some kind of hostage because that is not what we had agreed to." According to Mr. Cohen, Mr. Hirsch stated that he "was upset by the memorandum because it suggested Mr. Haymann did not believe in or trust Hirsch. Hirsch said he had no intention of leaving Town & Country. He said he was a long term player and was committed to the company."

Shortly after speaking with Mr. Cohen, Mr. Hirsch addressed his complaints directly to Mr. Haymann. According to Haymann, Hirsch reiterated what he had told Mr. Cohen, namely that the 1994 forgiveness date suggested that Mr. Haymann did not trust him, that he was loyal to the company, was committed to the company and that he saw himself as a long term player and a team player. He told Mr. Haymann that he could be trusted to stay at T & C even if the note was forgiven in 1993.

Based on Mr. Hirsch's assurances, Mr. Haymann agreed to forgive the loan in February, 1993. Mr. Haymann subsequently delivered to Mr. Hirsch a memorandum dated December 31, 1992 ("the December 31 memorandum"). It read as follows:

We refer to my memo dated December 15, 1992 regarding your remuneration package for 1993.

With reference to the paragraph "Demand note," we confirm that the promissory note for $25,000 signed by you, will be considered null and void as of 2/28/1993.

The challenges of 1993 should be seen as positive to our team.

On January 5, 1993, Mr. Haymann drafted yet a third memorandum ("the January 5 memorandum"). This memorandum was identical to the December 15 memorandum in all respects except that the section concerning the debt forgiveness had been changed. The revised language read as follows: "Provided you are still employed by the Town & Country Fine Jewelry Group through February 28, 1993, I will cancel this note and forgive your indebtedness on this $25,000 note as of 02/28/93" The printed date on the memorandum was December 15, 1992, however next to Mr. Haymann initials is the handwritten date "1–5–93."

Mr. Hirsch continued to work for T & C Group through March, 1993. On March 15, 1993, he announced his intent to resign from

the company. Shortly thereafter, he commenced working at London Star, Ltd., a competitor of T & C. It was later revealed that Mr. Hirsch had been in contact with London Star as early as September, 1992, and had been actively negotiating his move there during the very time he had been professing loyalty to T & C.

## III. *ANALYSIS*

■ Hirsch maintains that his oral statements of loyalty to T & C cannot form the basis of a cause of action under Massachusetts law because they are contradicted by Mr. Haymann's later written memoranda. T & C argues that there is no contradiction between Hirsch's statements and the memoranda and that, in any event, such memoranda cannot vitiate Mr. Hirsch's fraudulent representations. Viewing the evidence in a light most favorable to T & C, *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992), it appears that a fact finder could conclude that T & C reasonably relied on Hirsch's fraudulent representations to its detriment. Accordingly, Hirsch's motion for partial summary judgment must be DENIED.

### A. *Elements of Fraud*

■ To recover for fraud under Massachusetts law, a plaintiff must prove that "the defendant made a false representation of material fact with knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon that statement to his or her detriment." *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 226 (D.Mass.1990). "[S]tatements of present intention as to future conduct may be the basis for a fraud action if . . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 709, 563 N.E.2d 188 (1990).

■ In all cases, a plaintiff's reliance upon the statements of the defendant must be reasonable or justifiable. *Bolen*, 754 F.Supp. at 226; *Chedd–Angier Production Co., Inc. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 939 (1st Cir.1985); *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 667, 200 N.E.2d 241 (1964). A special case of the reasonableness requirement applies in situations involving contractual negotiations. Ordinarily, fraud in the inducement of a written contract may be proven by evidence external to the contract, *Broomfield v. Kosow*, 349 Mass. 749, 759, 212 N.E.2d 556 (1965), even if the contractual language generally disclaims defendants' liability for prior oral representations. *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941). However, when the parties to a contract have fully negotiated a specific term contained therein, and the written contract is intended by the parties as a statement of their complete agreement, it is no longer reasonable for a plaintiff to rely on a contrary representation made by the defendant during the course of negotiations. *See Plumer v. Luce*, 310 Mass. 789, 805, 39 N.E.2d 961 (1942); *Turner v. Johnson & Johnson*, 809 F.2d 90, 96–98 (1986); *McEvoy*, 408 Mass. at 710–712, 563 N.E.2d 188; *Carlo Bianchi & Co. v. Builders' Equipment & Supplies Co.*, 347 Mass. 636, 643, 199 N.E.2d 519 (1964). This exception recognizes the special significance of integrated contracts as legally enforceable agreements, rather than as mere evidence of the parties' intent. *Turner*, 809 F.2d at 96. *See also* Restatement of Contracts, Second, §§ 209, 215. Whether a writing constitutes an integrated agreement is a question of fact on which "proof may be received beyond the writing proper." *Antonellis v. Northgate Construction Corp.*, 362 Mass. 847, 849, 291 N.E.2d 626 (1973); *Carlo Bianchi*, 347 Mass. at 643, 199 N.E.2d 519. Restatement of Contracts, Second, § 214. Among the factors to be considered are the length of the writing, *Antonellis*, 362 Mass. at 850, 291 N.E.2d 626, whether the writing contains an integration clause, *Carlo Bianchi*, 347 Mass. at 643, 199 N.E.2d 519, and the conduct of the parties' prior negotiations. *Ryder v. Williams*, 29 Mass.App.Ct. 146, 149, 558 N.E.2d 1134 (1990). Ultimately, this inquiry attempts to determine the significance which the parties themselves attached to the writing. *Antonellis*, 362 Mass. at 849, 291 N.E.2d 626; *Carlo Bianchi*, 347 Mass. at 643, 199 N.E.2d 519; *Wang Laboratories, Inc. v.*

*Docktor Pet Centers, Inc.,* 12 Mass.App.Ct. 213, 219, 422 N.E.2d 805.

▮ In a contract action, a finding that the writing is not integrated permits the introduction of evidence of additional, oral conditions to the agreement. *See Antonellis,* 362 Mass. at 850–851, 291 N.E.2d 626. In the instant case, it would permit a finder of fact to consider whether, in making the contract, T & C reasonably relied on intentionally false representations which Mr. Hirsch made prior to the execution of the writing. *McEvoy Travel,* 408 Mass. at 713, 563 N.E.2d 188.

Two recent cases serve to illustrate these concepts. In *Turner, supra,* the plaintiffs had invented a novel medical thermometer, the rights to which they sold to defendant Johnson & Johnson ("J & J"). Under the terms of a lengthy purchase and sale agreement, plaintiffs were entitled to receive a royalty on future sales of the product. The agreement, however, was quite explicit in stating that J & J had no obligation to market the thermometer, and that J & J was free to market other products in the same field.

Subsequent to the sale, J & J developed a different thermometer which served a similar function to that of the plaintiffs, and chose not to market the plaintiffs' product. As a result, the plaintiffs received no royalty payments from sales of their invention. They subsequently brought an action alleging that J & J had fraudulently induced them to enter into the sale agreement by promising, among other things, that J & J would actively promote the sale and use of the plaintiffs' thermometer. The *Turner* court, applying Massachusetts law, held that such allegations could not be the basis for a fraud claim, since they were directly contradicted by the terms of the written agreement. It stressed that the agreement had been "fully negotiated" and "precisely set[ ] out the rights and obligations of two sophisticated parties." *Turner,* 809 F.2d at 97. The Court expressed a concern that if J & J's earlier statements were given any weight, "the language of the contract simply would not matter anymore." 809 F.2d at 96.

By contrast, in *McEvoy Travel, supra,* the Massachusetts Supreme Judicial Court upheld a fraud verdict against a challenge superficially similar to the one in *Turner.* 408 Mass. at 710–711, 563 N.E.2d 188. After extensive negotiations, the parties had entered into an oral agreement whereby the plaintiff, a small travel agency, was to serve as the exclusive travel agent for the defendant, a large multi-national conglomerate. The parties had orally agreed that this was to be a "long-term" arrangement. In reliance on this agreement, the plaintiff opened up an office in the defendant's corporate headquarters, solely for the purpose of booking travel requests from the defendant's employees.

After the agreement had already been in effect for two months, the defendant drafted a contract to memorialize the financial arrangements to which the parties had already assented. However, this written contract differed significantly from the oral agreement which was already in force. In particular, although the parties had agreed that the relationship was to be "long-term," the written contract stated that it was to be renewable on a yearly basis. Moreover, the contract contained a clause which permitted the defendant to cancel it on sixty days notice. Upon reading these newly inserted terms, the plaintiff objected. In response, the defendant's representative assured the plaintiff that the language was "meaningless" and "inoperative" and that the long-term agreement remained in effect. Based on the assurances, the plaintiff signed the agreement.

The written contract was renewed in the following two years, with only slight modifications in its financial terms. In the third year, however, the defendant exercised its rights under the agreement and terminated its relationship with the plaintiff. Subsequently, it was revealed that the defendant had been exploring, at the very time it drafted the initial written agreement, other arrangements for obtaining travel services, and had circulated an internal memorandum describing its relationship with the plaintiff as a "trial arrangement."

In upholding the lower court's fraud verdict for the plaintiff, the *McEvoy Travel*

court found that the plaintiff had reasonably relied on the defendant's assurances that the contract was to be a "long-term" arrangement, notwithstanding the written contract's language to the contrary. In doing so, the court focused on two important respects in which the *McEvoy* facts differed from those in *Turner*. First, in *Turner*, the alleged misrepresentations were made and apparently squarely addressed by the parties during a lengthy negotiation process. By contrast, the alleged misrepresentations in *McEvoy*, that the escape clause was meaningless and that the "long-term" nature of the agreement was still in force, were made just prior to the signing of the agreement, such that it was clear to both parties that the fraudulent statements were still "operative" at the time of signing. 408 Mass. at 712, 563 N.E.2d 188. Thus, it could not be said that the parties ever intended the final writing to supersede prior representations, since the defendant continued to make those representations even as the document was being executed.

Second, the *McEvoy* court noted that in *Turner*, the document in question had been fully negotiated, and several written versions had been exchanged between the parties prior to execution. In contrast, the contract at issue in *McEvoy* had been written entirely by the defendant, and no negotiation had taken place. The only discussion of the disputed terms was the defendant fraudulently assuring the plaintiff that they were inoperative. Thus it was evident that the parties could not have considered the written contract to be an integrated agreement.

### B. *Was There Reasonable Reliance on Hirsch's Representations?*

 As the foregoing discussion illustrates, narrow and formalistic rules of contract interpretation are no longer dispositive in the analysis of fraudulent inducement cases in Massachusetts. *See McEvoy*, 408 Mass. at 713, 563 N.E.2d 188 ("In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it."). The mere existence of a written docu-

ment can never immunize the commission of fraud in its procurement. *Bates v. Southgate*, 308 Mass. 170, 179, 31 N.E.2d 551 (1941). Rather the finder of fact must, after examining all of the circumstances, attempt to ascertain the significance which the parties themselves attributed to the document in question. *Antonellis*, 362 Mass. at 849, 291 N.E.2d 626; *Carlo Bianchi*, 347 Mass. at 643, 199 N.E.2d 519; *Wang Laboratories*, 12 Mass.App.Ct. at 219, 422 N.E.2d 805. Only if the fact finder determines that the parties intended the writing to exclude and supersede all prior representations can its existence serve as a defense against claims of fraud in the inducement. *McEvoy*, 408 Mass. at 710–711, 563 N.E.2d 188. Because the facts before me are clearly inadequate to make such a finding, Mr. Hirsch's motion must be **DENIED**.

In the instant case, it appears to be undisputed (and is in any event quite conceivable from the evidence) that Mr. Hirsch made intentional false statements of loyalty to T & C and that T & C relied on these statements to its detriment when agreeing to forgive Hirsch's $25,000 debt. According to Mr. Haymann's sworn statements, he was approached by Mr. Hirsch requesting various concessions in his employment terms. As part of his "sales pitch," Hirsch assured Haymann that he was a "long term player" and that he fully intended to remain in T & C's employ. When Haymann drafted a memorandum providing that the loan would be forgiven in 1994, Hirsch induced Haymann to change the terms by once again proclaiming his loyalty to T & C. Based on this evidence, a fact finder could easily conclude that T & C detrimentally relied on Hirsch's false statements.

Notwithstanding the ample evidence of his own misrepresentations, Mr. Hirsch argues that the existence of the various memoranda issued by Mr. Haymann somehow require this court to turn a blind eye to his apparently misleading conduct, and to rule in his favor as a matter of law. In support of his position, Hirsch attempts to analogize the facts in this case to those in the *Turner* case described above. The analogy fails in at least one significant respect.

The most important difference between the contract in *Turner* and the various memoranda in this case is that, in *Turner*, there was no question that the document being analyzed was a contract, and that it was clearly intended to contain all of the terms of the parties agreement. The contract had been revised numerous times and it stated, in clear, unambiguous language, that the defendant had no obligation to carry out the promises which the plaintiff alleged it had made. In sharp contrast, the facts in this case offer little or no basis for concluding that the documents in question here were ever intended by the parties to be integrated agreements. In particular, nothing in the documents specifically addresses and rebuts Hirsch's prior protestations of fealty to T & C and the record indicates that Mr. Hirsch continued to pledge allegiance to his employer even up to the date of the January 5 memorandum, the most recent writing before the court.

Indeed, the facts here are much more akin to those which supported a fraud verdict in *McEvoy Travel*. In that case, the defendant did not merely make a representation in the course of contractual negotiations, a representation which was later addressed and rebutted by clear contractual language. Rather, the defendant continued making false statements up to and including the time that the contract was signed. While these statements appear to be inconsistent with the language in the written agreement, it was apparent from the context that they were reasonably interpreted to trump any written representations to the contrary.

Similarly, in the instant case, the language of the January 5 memorandum appears, on its face, to give Mr. Hirsch a clear right to have his debt forgiven if he is employed on February 28, 1993. But those words, like the language in *McEvoy Travel*, cannot serve to nullify Hirsch's contemporaneous promises of long term allegiance. The agreement between the parties here obviously extended beyond the four corners of the written documents, and no doctrine of law or evidence prevents this court from considering all evidence of the parties subjective intent in determining Mr. Hirsch's liability for fraud.

The facts in support of Mr. Hirsch in this case are actually weaker than those raised by the defendant in *McEvoy Travel*. In that case, the document in question was clearly a contract which at least purported to specify the full terms of the agreement. By contrast, it is clear to me from reading Mr. Haymann's various memoranda that they were never intended to be formal integrated contracts, but are, rather, summaries prepared by Mr. Haymann of the financial aspects of the parties' prior oral agreement. None of the documents describe themselves as being a "contract" or "agreement" and none of them are signed by Mr. Hirsch. Indeed, the "Subject" of the January 5 memorandum is "Compensation Package" and its preamble states that it is intended to "clarify the financial parameters" of Mr. Hirsch's future employment. The memorandum contains no integration clause, and nowhere does it assert or otherwise indicate that it was intended by the parties as a "statement of their complete agreement." *Carlo Bianchi*, 347 Mass. at 643, 199 N.E.2d 519. Rather it appears to be a "memorand[um] of what had been previously decided." *Id.*

## IV. CONCLUSION

Based on the foregoing, I conclude that Mr. Hirsch has failed to meet his burden by showing that the undisputed facts require a judgment in his favor as a matter of law. Accordingly, Hirsch's motion for summary judgment must be denied.

For the foregoing reasons, defendant's motion for summary judgment is **DENIED**.

**SO ORDERED.**